# UNITED STATES DISTRICT COURT

### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  2:21-MJ-02811 |
| An Apple iPhone, bearing the serial number F2LXD0QAKPHQ, seized on May 22, 2021, in the custody of HSI | ) ) ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1591 | Sex Trafficking by Force, Fraud, or Coercion |
| 8 U.S.C. § 1328 | Importation of Alien for Immoral Purpose |
| 18 U.S.C § 1956 | Laundering of Monetary Instruments |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of_____days (*give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

_____
*Printed name and title*

AUSA: Chelsea Norell (213) 503-1674

## ATTACHMENT A

<u>DEVICE TO BE SEARCHED</u>

The following digital devices, detained from Riho OI and Shino SATO on May 20, 2021 and currently maintained in the custody of the HSI in El Segundo, California:

1.   An Apple iPhone, bearing the serial number FFXDR5FF0F09 ("SUBJECT DEVICE 1"); and

2.   An Apple iPhone, bearing the serial number F2LXD0QAKPHQ ("SUBJECT DEVICE 2") (collectively, the "SUBJECT DEVICES").

**ATTACHMENT B**

I.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband,
fruits, or instrumentalities of violations of 18 U.S.C. § 1591
(Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 2422
(Coercion and Enticement), and 8 U.S.C. § 1328 (Importation of
Alien for Immoral Purpose) (the "SUBJECT OFFENSES"), namely:

a.    Records, documents, programs, applications and
materials, or evidence of the absence of same, sufficient to
show call log information, including all telephone numbers
dialed from any of the digital devices and all telephone numbers
accessed through any push-to-talk functions, as well as all
received or missed incoming calls;

b.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the SUBJECT OFFENSES;

c.    Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the SUBJECT OFFENSES;

d.    Records, documents, programs, applications,
materials, or conversations relating to the trafficking of

15

humans, including ledgers, pay/owe records, customer lists, correspondence, receipts, records, and documents noting price, availability, and/or times when workers were bought, sold, or otherwise transported;

      e.  Audio recordings, pictures, video recordings, or still captured images relating to the sale of sex services and the collection or transfer of the proceeds of the SUBJECT OFFENSES;

      f.  Contents of any calendar or date book;

      g.  Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

      h.  Any SUBJECT DEVICES used to facilitate the above-listed violations (and forensic copies thereof).

      i.  With respect to any SUBJECT DEVICES used to facilitate the SUBJECT OFFENSES or containing evidence falling within the scope of the foregoing categories of items to be seized:

      i.  evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

      ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software,

16

as well as evidence of the presence or absence of security
software designed to detect malicious software;

            iii. evidence of the attachment of other devices;

            iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

            v.   evidence of the times the device was used;

            vi.  passwords, encryption keys, and other access
devices that may be necessary to access the device;

            vii. applications, utility programs, compilers,
interpreters, or other software, as well as documentation and
manuals, that may be necessary to access the device or to
conduct a forensic examination of it;

            viii.   records of or information about
Internet Protocol addresses used by the device;

            ix.  records of or information about the device's
Internet activity, including firewall logs, caches, browser
history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

   2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICES</u>

1.     In searching the SUBJECT DEVICES (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search the SUBJECT DEVICES capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.     The search team will, in its discretion, either search the SUBJECT DEVICES where they are currently located or transport them to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.     The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in the SUBJECT DEVICES capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICES and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or

18

encrypted data to determine, pursuant to the search protocols,
whether the data falls within the scope of the items to be
seized.

ii.  The search team may use tools to exclude
normal operating system files and standard third-party software
that do not need to be searched.

iii. The search team may use forensic examination
and searching tools, such as "EnCase" and "FTK" (Forensic Tool
Kit), which tools may use hashing and other sophisticated
techniques.

e.  The search team will not seize contraband or
evidence relating to other crimes outside the scope of the items
to be seized without first obtaining a further warrant to search
for and seize such contraband or evidence.

f.  If the search determines that the SUBJECT DEVICES
do not contain any data falling within the list of items to be
seized, the government will, as soon as is practicable, return
the SUBJECT DEVICES and delete or destroy all forensic copies
thereof.

g.  If the search determines that the SUBJECT DEVICES
do contain data falling within the list of items to be seized,
the government may make and retain copies of such data, and may
access such data at any time.

h.  If the search determines that the SUBJECT DEVICES
are (1) themselves an item to be seized and/or (2) contains data
falling within the list of other items to be seized, the
government may retain the digital device and any forensic copies

19

of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.   The government may also retain the SUBJECT DEVICES if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.   After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

2.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

3.   During the execution of this search warrant, law enforcement is permitted to (1) depress Riho OI and/or Shino SATO's thumb- and/or fingers onto the fingerprint sensor of the SUBJECT DEVICES (only if the device has such a sensor), and

direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the devices in front of Riho OI and/or Shino SATO's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

4.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**<u>AFFIDAVIT</u>**

I, Andrew Cox, being duly sworn, declare and state as follows:

## I.   **<u>INTRODUCTION</u>**

1.   I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since January 2019.  I am currently assigned to the Office of the Assistant Special Agent in Charge Los Angeles International Airport ("LAX") where I investigate a range of crimes to include money laundering, human trafficking, and other sex related crimes.

2.   My formal training began in 2010 at the Air Force Security Forces/Police Academy.  I have attended the Federal Law Enforcement Training Centers Criminal Investigator Training Program and HSI Special Agent Training Program.  During this instruction, I had an opportunity to learn how to conduct human trafficking and enticement for the purpose of prostitution investigations.  Additionally, I learned how to conduct money laundering investigations and view various money laundering methodologies and operations used by transnational and domestic criminals.

3.   I have arrested and interviewed subjects, executed search warrants, conducted physical surveillances, utilized electronic and video surveillance, and spoken to informants, suspects, and other experienced investigators regarding these matters.  Additionally, I have participated in different roles of money laundering investigations alongside experienced senior SAs and TFOs.

1

4.    Based on my training and experience, I am familiar with the methods of operation used for the persuasion, enticement, harboring, promotion, and facilitation of individuals to travel in interstate or foreign commerce to engage in prostitution, as well as the collection of proceeds of such activity and methods of money laundering used to conceal the nature of the proceeds.

## II.  **PURPOSE OF AFFIDAVIT**

5.    This affidavit is made in support of an application for a warrant to search two digital devices detained by the Homeland Security Investigations ("HSI") on May 22, 2021, as described more fully in Attachment A:

1.    An Apple iPhone, bearing the serial number FFXDR5FF0F09 ("SUBJECT DEVICE 1"); and

2.    An Apple iPhone, bearing the serial number F2LXD0QAKPHQ ("SUBJECT DEVICE 2") (collectively, the "SUBJECT DEVICES").

6.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1591 (Sex Trafficking by Force, Fraud, or Coercion), 18 U.S.C. § 2422 (Coercion and Enticement), 8 U.S.C. § 1328 (Importation of Alien for Immoral Purpose), and 18 U.S.C § 1956 (Laundering of Monetary Instruments) (the "SUBJECT OFFENSES"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

7.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested search warrant
and does not purport to set forth all my knowledge of or
investigation into this matter.  Unless specifically indicated
otherwise, all conversations and statements described in this
affidavit are related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

8.   On the afternoon of May 20, 2021, United States
Customs and Border Protection Officers ("CBP") encountered Riho
OI and Shino SATO at LAX.  OI and SATO were attempting to depart
the United States via United Airlines flight number 32 from Los
Angeles, California to Narita, Japan.  Upon further inspection,
OI and SATO admitted to engaging in prostitution at the
direction of Chinghsi YEN (further referred to as, "ANDY").
ANDY is a suspected facilitator of a commercial sex trade
business that recruits women from various eastern Asian
countries to work in residential brothels located in Rowland
Heights, California.

### IV.  <u>STATEMENT OF PROBABLE CAUSE</u>

9.   Based on my review of law enforcement reports,
communications with other law enforcement officers, as well as
my own observations and knowledge of the investigation, I am
aware of the following:

10.   On Thursday, May 20, 2021, at approximately 12:00
p.m., CBP officers at LAX encountered OI and SATO attempting to

depart the United States for Narita, Japan via United Airlines
flight number 32.

11.  OI and SATO were referred to CBP outbound secondary
inspection due to their travel records being linked to a known
IP address used to purchase airline tickets for subjects
departing the United States with undeclared bulk currency.
During the inspection, United Airlines representative Mitzi
Kaido served as a Japanese translator for OI.  SATO clearly
articulated she was able to continue the inspection in the
English language.

12.  Prior to inspection, both OI and SATO were instructed
that the transportation of currency or monetary instruments,
regardless of the amount, is legal; however, if more than
$10,000 in U.S. currency, or its equivalent, is being exported
or imported to the United States, it must be reported to CBP.
OI verbally reported that she had approximately $1800 U.S.
currency in her possession when asked by CBP officers.  SATO
verbally reported that she had approximately $2000 U.S. currency
in her possession when asked by CBP Officers. During outbound
secondary inspection, CBP officers identified OI and SATO's bags
by verifying the luggage tags and confirming ownership with OI
and SATO.  After confirming the luggage belonged to OI and SATO,
CBPO officers inspected OI and SATO's luggage.  CBP officers
discovered approximately $18,529 in undeclared currency
concealed in OI's luggage.  CBP officers discovered
approximately $9,649 in undeclared currency concealed in SATO's
luggage.

13.  CBP officers then interviewed OI and SATO to determine their future admissibility to enter the United States.  CBP routinely conducts admissibility interviews of outbound travelers to determine the future admissibility of persons who enter the United States for reasons other than their Visa or ESTA applications permit.  During these interviews, CBP asked OI and SATO about the origin of the undeclared funds.

14.  At approximately 1:10 p.m. CBP reported the following to me, based on their separate interviews with OI and SATO:

a.  At first, OI and SATO both stated that they had travelled to the United States for vacation and to find English language schools; however, they both later admitted in their interviews that they had travelled to work as sex workers for ANDY at 18975 Bachelin Street, Rowland Heights, California 91748 (further referred to as the "Bachelin Address").

b.  OI and SATO each stated that they resided at the Bachelin Address for the entire trip to the United States.

c.  OI and SATO each stated that ANDY instructed them to evade currency reporting requirements by intentionally not declaring the currency in their possession when departing the United States because CBP would seize it.

d.  OI and SATO each stated that ANDY suggested they both have the currency in their possession sent to Japan prior to their trip and that he could introduce them to someone who would send the currency overseas for them.  OI and SATO stated that they declined ANDY's offer to broker the currency transfer through a third party.

5

e.  OI and SATO each stated to CBP that ANDY operates the website www.Andyvips.com, which advertises sex workers that he is actively managing at the Bachelin Address and another address near the Bachelin Address, which neither of them had visited.

f.  OI and SATO stated that ANDY employs an Asian male named DAVID and a woman named CHINI to help run the two brothel operations.

g.  OI and SATO stated that they were paid $500 U.S currency per hour by clients of the commercial sex trade business.  Based on their agreements with ANDY, they would keep $300 U.S. currency and give ANDY $200 U.S. currency. Additionally, OI and SATO reported that in order to be housed by ANDY at the Bachelin Address, they would have to agree to pay rent to ANDY from their earnings working as sex workers.  OI reported that she made a total of $20,000 U.S. currency in two weeks while working for ANDY.  SATO stated she made a total of $25,000 U.S. currency while working for ANDY.

15.  SATO stated to CBP that on a prior trip to the Los Angeles County, California area in 2020, she worked as a sex worker for a separate facilitator of a commercial sex trade business.  SATO stated that during her 2020 trip, she worked for a Chinese male named Ming Ming who operates a commercial sex trade business known as "Miya's House."  SATO stated that Miya's House operates brothels at 530 South Garfield Ave, Monterey Park, California 91754, 228 South San Marino Ave, San Gabriel, California 91776, and 125 East Graves Ave, Monterey Park, California 91755 (further referred to as the, "125 East Graves

6

Address"). SATO stated that while staying at the 125 East Graves Address, she was forced to stay in the garage where only a mattress and water were provided, and she was not permitted to leave until she served as a sex worker for ten days. SATO stated that the only time she was permitted to leave the garage was to enter a room of the residence to provide services to clients of the commercial sex trade business. SATO stated that the employees of the 125 East Graves Address only spoke Chinese and treated SATO very poorly, including keeping her in the garage during the heat of the day with only water and no food except when her employer would bring it to her in the garage. SATO stated that she was instructed to stay away from windows so she would not be seen and felt threatened by the workers of Miya's House.

16. Due to initially inconsistent stories provided by OI and SATO regarding their current visit to the United States, CBP decided it needed to inspect the SUBJECT DEVICES to determine OI and SATO's admissibility in the United States. CBP officers provided OI and SATO with CBP Inspection of Electronic Devices pamphlets, which detailed CBP's authority to examine the SUBJECT DEVICES. OI and SATO provided verbal consent to search the SUBJECT DEVICES and provided CBP officers the respective passcodes for unlocking the SUBJECT DEVICES. However, because OI and SATO consented after they received the Inspection of Electronic Devices pamphlets, I do not rely on their consent or the fruits of that manual review of the SUBJECT DEVICES to demonstrate probable cause to support this warrant.

## V.   TRAINING AND EXPERIENCE REGARDING HUMAN TRAFFICKING OFFENSES

23.   Based on my training and experience and familiarity with investigations into human trafficking conducted by other law enforcement agents, I know the following:

a.   Human traffickers and those working in their control often maintain books, receipts, notes, ledgers, bank records, and other records relating to the recruitment, enticement, transportation, and booking and sales activity related to human trafficking.  The previously mentioned records are often maintained where the human trafficker or their employees have ready access to them, such as on their cell phones and other digital devices.

b.   Communications between people buying and selling sex services take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the sex workers and brothel locations between the seller, buyer, and employees, as well as the negotiation of appointment times and price.  In addition, it is common for people engaged in human trafficking to have photos and videos on their cell phones of advertisement and solicitation activities.

c.   Human traffickers and their employees often keep the names, addresses, and telephone numbers of their human trafficking associates and customers on their digital devices. Human traffickers and their employees often keep records of

8

meetings with associates, and customers on their digital
devices, including in the form of calendar entries and location
data.

17.  In sum, based on my training and experience, my
knowledge of ANDY and Miya House, and the information OI and
SATO provided during the admissibility interviews, I believe
there is a fair probability that evidence, fruits, and/or
instrumentalities of the SUBJECT OFFENSES are contained on the
SUBJECT DEVICES.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

18.  As used herein, the term "digital device" includes the
SUBJECT DEVICES.

19.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

9

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

20.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

21.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's

11

fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress OI or SATO's thumb- and/or fingers on the device(s); and (2) hold the devices in front of OI or SATO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

22.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

23.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which

constitute evidence, fruits, and instrumentalities of violations

of the SUBJECT OFFENSES will be found on the SUBJECT DEVICES, as

described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of June,
2021.


_____
UNITED STATES MAGISTRATE JUDGE

13